Madam Clerk, please call the first case of the afternoon. 115-1513, New Hampshire Urena v. Ecologic Contract Counsel, you may proceed. I'm going to use the only one here. Okay. Yes, we have counsel tables. We'd like you to sit down and review this. Thank you. Pardon? Whenever you're ready. Whenever you're ready. We're ready now. Thank you. Judges, if it may please the court, it's the Plaintiff Appellant's Contention Act. Counsel, who are you? My name is Andrew Kriegel. I'm here on behalf of Plaintiff Appellant Elias Urena. If it may please the court, it's the Appellant's Contention that the Commissioner is a matter of law and failing to award him 100% loss of his right eye after his July 11, 2001 traumatic eye injury, which he suffered due to a penetrated nail ring wound while working at Eagle Concrete. There is no dispute as to the extent of the visual acuity in Appellant's right eye. In fact, the independent medical examiner hired by the respondent, in this case, had measured the vision and testified this was an objective finding as being only able to see hand motions. Appellant's treating physician measured his vision as only able to be seeing hand motions as well in the right eye. And the courts, I believe, are clear in the appellate court cases as to what the standard is for loss of vision in an eye and how to compensate that. Well, the Commission, I mean, they found that the claimant's loss of use had increased to 75%. Yes. But here's my question. What did they base that on? Are there any factual findings to support the Commission's determination that disability had increased to even 75%? Yes, Your Honor. Before the second procedure, his vision was at 20 over 400. It is now at only counting fingers at 2 feet, 4 feet. Well, what is counting figures at 2 feet, 4 feet? 20 over what? Counting fingers means that a person can only see fingers in front of his eye. But what does that mean? I mean, you know, what's the acuity level? I mean, if you were to tell us that counting fingers is 2,400 and it was 2,400 to start with, we'd say this was against the manifest way of the evidence because there had been no change. But until they tell us how they computed 75%, how are we to determine whether it's supported by the manifest way of the evidence? Your Honor, counting fingers is worse vision than... Who says who? That's the standard in the industry. In fact, Respondent's Independent Medical Examiner testified that Appellant's vision has gotten worse since the time of his first independent medical exam. I don't think we have any difficulty with the finding that it got worse. What we're having difficulty with is the computation of 75%. You may be right. Maybe it should be 100%. But until we know how they computed it, how do we make a determination if it's supported by the manifest way of the evidence? I'm at a loss to know how they computed this. And, Your Honor, that is our argument that it was not computed properly based on prior appellate court cases that have held that 20 over 200 vision has been described by the court to be a complete industrial loss of sight and that the loss of a member is complete when the normal use of that member has been taken away. Well, if you're acknowledging that it wasn't computed properly, what then as a follow-up are you asking us to do? We are asking for the court to remand this back to the commission with instructions to be computed at 100% loss of an eye based on the objective findings that... Well, I don't know that we'd be going that far, but certainly there's case law that says when the commission gives no reasons, there's no underlying factual findings for us to review, it probably should be remanded. Thank you, Your Honor. Is there anything further you would like explained from my brief, judges? No, I don't believe there is. Thank you. Thank you, counsel. Counsel, you may respond. May it please the court, Your Honors, Erica Rogina, I represent the Defendant Eagle Concrete Contractors. There is, in fact, evidence in the record as to the plaintiff's visual acuity, so I will address that from the outset. Plaintiff's treating physician, Dr. Mack, testified that plaintiff's measurable visual acuity is 20-70. He explained that 2400 to 2200 constitutes legal blindness. There was no evidence to contradict this. He further testified that not only is plaintiff not entirely blind in the right eye, but with the use of the other eye, in addition, he sees well enough to drive. Dr. Park testified that plaintiff was more than legally blind in the right eye, but she conceded this was based upon tests, which had a subjective component. The fact of the matter is here that this is not, as a matter of law, a de novo case. This is a manifest way of the evidence case, and the courts have talked about taking all of the circumstances into consideration to determine whether there was a material change in the work-related condition. So are you disputing there was a material change, or you're living with the 75 percent? We are living with the 75 percent. How is it computed? Could you point to me and tell me how this was computed? It was the initial 75 percent. Isn't at issue here, Your Honors. That was decided at the initial. We know what has been decided. We know what the base is. It's 2400, I think. But what is the comparison that makes it 75 percent? He says it should be 100 percent. How do you compute this? Well, what he's saying is that the 19-H is the only issue on appeal. The commission found 25 percent on the 19-H. Counsel is arguing for 50 percent, which would make a total award. The underlying proceedings, those are not at issue. There's no appeal on the 50 percent. That's done. That was appealed to the commission. So on the 25 percent. Let me state the question again. Maybe we can get to it. How did we go from 50 to 75 as opposed to 50 to 100? How did they compute it? They did it based upon the entirety of the record. 25 percent is supportable in the record. The Lambert case has an additional 25 percent. It's completely supported in the record. Based on the evidence by the expert, by the treater, by the visual acuity testing. The visual acuity testing, if he was legally blind and if counsel is asking for 100 percent of the eye, that would mean 2400 within a range of 2400 and 2200. Here, it's 2070. No, no, ma'am, it's not 2070. April the 12th, 2010, Dr. Mack said it was 2070. He then refers him to Dr. Conti, who examines him on October the 21st, 2010. Conti finds him to be 2030. I would like to know how the commission computed this and what they relied on because they don't tell us. There's a thing in this opinion that tells us how they computed this. The decision is supportable based upon the entirety of the record. Wait a minute. They may be right. They may not be right. The only thing I'm telling you is I can't figure out how they did it. And if I can't figure out how they did it, they're going to have to do it over again. Well, I will also say, Your Honor, if plaintiff is arguing that the decision is against the manifest weight of the evidence, it is plaintiff's burden of proof to establish that. He contends that when there's evidence that the only thing the man can see is fingers at two feet, that is 100 percent blindness is what he's contending. Now, I don't know where he gets that from, but that's his contention. And so he's saying that if he was only 50 percent at the original hearing and now he can't see anything other than two fingers in front of his eye or one foot, that that's total blindness. Well, let me add, Your Honor, that's not all the evidence with due respect that was in the record in this case. There is evidence that plaintiff's own treating physician found symptom magnification. That is Dr. Mack, his own testimony. The plaintiff's testimony, on one hand, I can't see anything, is not supported when his own treating physician says 20-70, which is not legal blindness, and plaintiff's own treating physician says that his patient has magnified his symptoms. The standard on the 19-H is an increase. It's plaintiff's burden of proof to establish the material change. Your Honor, he conceded that it went up to 75 percent. You're not disputing that. Maybe we're not communicating on the same level. You say the record supports 75 percent. He says with equal vigor that the record supports 100 percent. What we, I think, up here are saying is what did the commission, what are the factual findings they made to show that it was 75 percent? Did they delineate specific factual findings and reasons as to why they arrived at 75 percent? The commission found on the entirety of the record. So you're acknowledging they didn't make specific findings. The visual acuity, the testimony of Dr. Mack, the testimony of Dr. Powell. And they said that's why it went from 50 to 75. 75 percent was determined based on what? The entirety of the record or upon specific findings. Let me put it this way procedurally. Apparently you're accepting an increase because you filed no cross review. That's correct. Okay. So apparently, and we don't care how they came up with 50 percent because it was never reviewed. Correct. So I think the question that's being asked is there sufficient evidence in this record for any increase at all? I mean, I'm just trying to put it in the context. I understand. I can tell you right now if your honors were to find that there's evidence, that there's insufficient evidence for any increase, your honors would be correct on the record. And I can specifically point to the evidence as to why this would be correct. You didn't file a cross appeal. That's correct. There's no sense in you arguing that. Let me ask you a question, though. I think what is the standard that the commission used? Did they compare his uncorrected vision before to his uncorrected vision after? He didn't wear glasses before. Is that right? Correct. And we don't know what the commission, because you have a lot of data here, 2070 with glasses, 20 later without glasses. What standard did they use? They used the visual acuity testing of 2070. That is, yes, in addition to looking at the testimony. Wait a minute, where did they say that? How do we know that? Where did they say they used 2070? They looked at the entirety of the record. Oh, no, so they didn't say they used 2070, did they? That's in the record. Well, so is, wait a minute, not only is 2070 in the record, 2030 is in the record, 10, 21, 10, and so is 2025. Which is it? If we're going to look at the whole record, would we take an average of these and say that's what we use? Which one did they use? The decision is supported by the manifest way, Your Honor. You're not answering my question because I don't think you can. You cannot tell me what visual acuity they used to determine that this man went from 50 to 75. If you know, tell us. If you know, tell us, and don't tell us the entire record. Tell us which visual acuity. The issue is whether there is sufficient evidence in the record to support the decision. You've said that before, and you're not answering my question. I don't know. I don't know is a good answer sometimes. Because we don't, the commission didn't say what they used. I mean, it's okay to say we don't know what they used. The commission didn't say. That's all. What I'm saying is that I don't think it's necessary to focus on any one factor when you have a record. You have a treating physician who said this man is not legally blind. I don't think he said he's not legally blind. He said he's not totally blind. Okay, he's not totally blind. We know he's not legally blind because the 2070 or the 2030 is a far cry from the 2200. So we know he's not legally blind based upon anything. Your opposing counsel has raised the issue, what is the standard? And you cited a case. It's a 1952 case, Illinois Supreme Court, Landward v. Industrial Commission. In the Landward case, the Supreme Court did say, or they did in that case, compare corrected vision to corrected vision. If I remember right. And if I remember right, what the opposing counsel is saying is you should compare uncorrected to uncorrected or corrected to corrected, but you shouldn't compare uncorrected to corrected vision. And we have a case here where the man didn't wear glasses before. His vision can be corrected to a certain extent with glasses. But without the glasses, if you compare uncorrected to corrected, he's legally blind. So it's a legitimate issue, is it not? What is the standard? I'll tell you why that's not an issue in this case. It's because we're not in the underlying proceedings of the original arbitration. Where we're at now is from the time of the arbitration through the 19-H. So we're not going back to the time frame when he originally was uncorrected. That's built into the 50%. We are now at the point, and that's why I think I know. So you say it's corrected to corrected. At this point, it's where he was at the time of arbitration and where he was at the time of the 19-H. And that brings us back then to what standard did the commission use that we don't know? The commission looked at the entirety of the record because you have to show a change in condition, and this is why I'm going to go back to this evidence. On the change, let's start with the evidence. This is the evidence that we do have in the record, and that does not require a remand. Plaintiff testified at both hearings he could not see out of his right eye. Both hearings. According to plaintiff, there's no material change in his vision. Dr. Park testified that she evaluated plaintiff in May of 2011. He reported, quote, no vision since his original injury. Again, according to plaintiff himself, because we're dealing with the evidence in the record, not necessary to remand, there's been no material change. Wait a minute. Slow down. The commission didn't believe him when he said he couldn't see. They gave him 50% of the eye. You're stuck with it. That's what he is. That's his base, 50%. Nothing you can do about it. Can't relitigate it. Wasn't appealed. He's 50%. That's at the time of the original hearing. Now we have the 19H, and we have one doctor that says 2070, another one says 2030, another one says 2025. He says I can't see at all, and the commission gives him 75% of an eye. Please tell me how they computed that number. They didn't do a mathematical computation, Your Honor. What they did is they took him from 50%, and Your Honor is correct. What I was saying is not inconsistent with the fact that they found 50%. What I'm saying, sitting here today on the 19H, all that's relevant to this appeal and the burden of proof that plaintiff has is to show a material change. So if he testified I couldn't see that, I couldn't see now. No, you're wrong. They found that he was 50%. They didn't believe he couldn't see that. And evidently they didn't believe for some reason that he couldn't see now because they ordered him 75%. The issue on this appeal is whether the 75% is supported by the manifest weight of the evidence or if based upon the manifest weight of the evidence he is entitled to 100%. And I said to you and asked you for the 50th time, how did they compute 75%? Because until we know how they computed it, how in heaven's name are we supposed to know if it's supported by the manifest weight? We know that 100% is not supported by the manifest weight. We know he's not legally blind. We know he returns to... No, no, no, he is legally blind. We don't know if he's totally blind. Because the commission itself said legal blindness, there's no support for the proposition that legal blindness equals total blindness. They put that in their opinion. Well, Dr. Mack testified that plaintiff's measurable visual acuity is 27. He explained that 2400 to 2200 constitutes legal blindness. There's no evidence to contradict this. So the evidence in the record stands for the proposition this is not a 100% loss of use case. Well, that argument has a lot of logical and intuitive appeal, but it doesn't answer the question. We can see based on that maybe it isn't 100%, but how do we know it's 75 is the appropriate standard? I will read to you from the commission's decision. Plaintiff also appears to mistakenly rely on the label of being, quote, legally blind as his support for having 100% loss of use of the eye. Plaintiff cites no cases that equate legal blindness per se as 100% loss of use of the eye, though, more importantly, the record shows that the arbitrator noted that plaintiff's subjective complaints of vision worse than legal blindness back in 2006 at the original hearing when he awarded him 50% of the eye. That was Dr. Park, and Dr. Park, the IME, was contradicted by the treating physician. The commission adopted and went with the finding of the treating physician over Dr. Park because Dr. Park conceded her testing was based on subjective element, and the plaintiff's own treating physician, which is typically in workers' compensation cases, afforded greater deference unless there's something to show in the record as to why he or she shouldn't be afforded that deference. The plaintiff's own doctor testified that his patient magnified his subjective symptoms. We understand all that, and you keep dancing around the question that I keep asking. First of all, what is total blindness? What is the acuity level that this substantiates as total blindness? Dr. Mack testified that 2400 to 2200 constitutes legal blindness. Total blindness in the pedestrian sense would mean he can't see anything. This is a man who drives, okay? His doctor has allowed him to drive. He's pointed out that he can drive. Except for one problem. The commission seems to find that legal blindness is not the equivalent of total loss of use, 100% loss of use of an eye. So your 2400 to 2200 is meaningless because they rejected it. They said it. It's evidence in the record from which they make a decision. Easy, easy. They rejected it. They said that the label of being legally blind is not the same as 100% loss of use of an eye. They said that. So your 2400 to 2200 being legally blind is irrelevant to their decision. So my question is, if legal blindness is not the measure, what is for 100% loss of use? Is it 2025? Is it 2070? I don't know. 100% loss of use would involve visual acuity, would involve other elements. What visual acuity? What visual acuity? I don't know. And if you don't know, I don't know. But there's other elements beside. We know in this case that this man had 2070. And we know in this case that this man went back to full-duty work. We know in this case that his testimony that he couldn't see anything was undermined by his own treating physician. This is the plaintiff's burden of proof to establish a material change in the work-related condition. No, but that's a given. They've already found that and you didn't appeal it. There is a change. On the 19-H. From the time of the arbitration, from the 50% award to now. It would have to be increased above 50% in the original award for there to be an increase in the 19-H. You've not appealed it, so you conceded it. My question is how much of an increase? That's all we're talking about here. How much? It's our position that all of the evidence in the record makes the 25% consistent with the record, the law, the testimony of the physicians. And that's why we didn't appeal it. But if the plaintiff is arguing for 100% loss of use of his eye, he has the burden of proof. Not only with regard to the standard, but with all the evidence that goes to the standard. And he hasn't met that burden of proof. So the appeal, his request for 100% should be denied. What was his visual acuity at the time that the commission gave him 50% of an eye? What was the testimony of his visual acuity then? I don't have that. I know that the 2070 was after he underwent the corneal graft procedure. He subjectively reported 2400 to Dr. Geyser. He failed in his attempts to find an objective cause for the decreased vision. That was Geyser. I'm having a problem here. If the plaintiff says I'm entitled to 100%, there's no question he has to prove the 50% he's entitled to. The commission has given him 75%. Whether he's entitled to more than the 75% has to be determined based upon what's in this record. And in order to do that, I have to know how they got the extra 25%. And you keep saying based on the whole record. It's based on the entire record. I will say this as well. Plaintiff is not even arguing for a manifest weight. He's arguing for as a matter of law. And there's no evidence for that. Thank you, Counsel. Thank you. Counsel, do you have any reply? I have a short reply. In the commission's decision on the 19-H and 8-A review, they note that the petitioner had 2070 visual acuity with that corrective lens. And it's our contention that the case law is clear that the measurement of visual acuity for loss of an eye and how we compensate the loss should be either corrected to corrected vision or uncorrected to uncorrected vision. So it's the appellant's contention that the commission did err as a matter of law in misapplying this standard when they issued their 19-H, 8-A decision. Okay. Thank you, Counsel. Thank you. Let me admonish Counsel again. Please use the Counsel table all during the argument. I personally think it's not respectful of opposing counsel not to use Counsel table and stay there. Thank you. This matter will be taken under advisement and written disposition shall issue.